UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| PAUL DIPIETRO, MARIE L. ZWEIG<br><br>   Plaintiffs,<br><br>   -against-<br><br>NEW YORK STATE UNIFIED COURT SYSTEM, NEW YORK STATE OFFICE OF COURT ADMINISTRATION, JANET DIFIORE, LAWRENCE K. MARKS, JUSTIN BARRY, NANCY BARRY, ROSEMARY MARTINEZ-BORGES, JENNIFER DILALLO, SHAWN KERBY, KEITH MILLER, LINDA DUNLAP-MILLER, SCOTT MURPHY, MICHELLE SMITH, JOHN SULLIVAN, and DAN WEITZ<br><br>   Defendants | **AMENDED COMPLAINT**<br><br>Case no. <u>1:22-cv-07943</u><br><br>Jury Trial: ☒Yes ☐No |

1

## PRELIMINARY STATEMENT

The greatest philosophers in the history of the world have debated the existence of God. Ultimately, these great minds could not definitively prove that God exists. No one can prove that God exists. Yet millions of people across the globe worship a higher power called God. There are countless religions. Each one has a unique set of views and practices. The number of differences between religions is nearly infinite. Moreover, people of the same faith or religion possess differing beliefs. Their beliefs are not necessarily static but may change over time. Entire nations have gone to war over opposing religious views. Human beings' relationship with God and religion is as nuanced as it is perplexing. An individual's religious beliefs are intangible to everyone else. However, they are very real for the individual.

The defendants audaciously tried to quantify religious beliefs. They read one thousand applications—with the applicant's personal information removed—in a futile attempt to ascertain whether the applicant's beliefs were sincere. Undertaking such an endeavor alone, demonstrates the defendants did not know what they were doing. Something as intangible, complex, and specific to the individual as religious beliefs cannot neatly be put into a box and wrapped with a bow. Then, as discussed *inter alia* Defendants discriminated against Plaintiffs.

Plaintiffs have never wavered from their religious beliefs. They put their careers and livelihood on the line. They have remained steadfast throughout. They have faith that justice will be done on earth as it is in heaven.

## PARTIES

1. Paul DiPierro was at all relevant times herein a Senior Court Officer employed by the New York State Unified Court system (UCS).

2. Marie L. Zweig was at all relevant times herein employed by UCS as a Principal Appellate Court Attorney with the Appellate Division, Second Department located in Brooklyn, New York.

3. Defendant Unified Court System (UCS) is the Judicial Branch of New York State pursuant to article VI of the State's Constitution. Its principal place of business is 25 Beaver Street, first floor, New York, New York, 10004.

4. Defendant Office of Court Administration (OCA) is the administrative arm of the UCS, with its principal place of business located at 25 Beaver Street, room 852, New York, New York, 10004.

5. At all relevant times herein, Janet DiFiore (DiFiore) was the Chief Judge of the New York State Court of Appeals and was responsible for initiating the statewide vaccine mandate as well as all administrative policies and procedures.

6. Defendant Lawrence K. Marks (Marks) was at all relevant times herein the Chief Administrative Judge and was responsible for overseeing and implementing statewide administrative policies over court operations such as the vaccine mandate.

7. Defendants Justin Barry, Nancy Barry, Rosemary Martinez-Borges, Jennifer DiLallo, Shawn Kerby, Keith Miller, Linda Dunlap-Miller, Scott Murphy, Michelle Smith, John Sullivan, and Dan Weitz were at all relevant times

3

herein members of the Vaccination Exemption Committee (VEC). The VEC denied Plaintiffs requests for religious accommodations.

8. The determinations and conduct challenged in this complaint were at all relevant times herein made in Defendants administrative capacity.

9. At all relevant times herein, Defendants were acting under color of law.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

10. Plaintiff DiPierro received a right to sue letter from the EEOC a few days after the date it was sent (EXHIBIT 1) and timely initiates this action.

11. Plaintiff Zweig received a right to sue letter from the EEOC (EXHIBIT 2) and timely initiates this action accordingly.

## JURISDICTION AND VENUE

12. This Court has original jurisdiction pursuant to 28 U.S.C. §1331, 28 U.S.C. §1343(a)(3) and Title VII of the Civil Rights Act as amended in 42 U.S.C. §2000 et seq. This Court has supplemental jurisdiction pursuant to 28 U.S.C. §1367(a).

13. The United States District Court for the Eastern District of New York is the proper venue pursuant to 28 U.S.C. §1331 (b)(1) and (b)(2) as it is the judicial district in which Defendants deprived Plaintiffs of their rights under the Constitution of the United States and it is where a substantial part of the events giving rise to Plaintiffs' claims occurred.

## STATEMENTS OF FACTS

14. Mr. DiPierro was a Senior Court Officer. He has dedicated twenty-four (24) years of public service working in the courts.

15. Mr. DiPierro has over sixteen (16) years of experience as an adjunct instructor in firearms, defensive tactics, and medical intervention.

16. Mr. DiPierro also served over twelve (12) years as a member of the elite Special Response Team (SRT). The SRT handles emergency crisis situations that threaten the public, judges and court staff.

17. Mrs. Zweig was a Principal Appellate Court Attorney with the Appellate Division, Second Department for about twenty (20) years.

18. Mrs. Zweig did not work in the courthouse.

19. Mrs. Zweig worked in a commercial building where she had her own private office.

20. When the courts were closed from April 2020 through May 2021, Mrs. Zweig worked remotely without incident. She met every deadline and performed her work as expected.

21. From May 2021 through the fall Mrs. Zweig worked in person.

22. From May 2021 through the fall Mr. DiPierro worked in person.

23. Plaintiffs did not go to work sick.

24. Plaintiffs did not infect anyone.

25. Plaintiff DiPierro is Catholic.

26. Plaintiff Zweig is Episcopalian.

27. Plaintiffs were able to work in person without incident until DiFiore unilaterally issued the Mandate.

28. Pursuant to Article VI of the New York State Constitution The New York State judiciary is established under a unified court system (UCS).

29. N.Y. Const. art VI §28 establishes an administrative board of the courts which consists of the chief judge of the court of appeals and the presiding justices from the appellate division of the supreme court of all four (4) judicial departments.

30. On or about August 25, 2021, DiFiore, and Marks, via email, announced its mandatory vaccination requirement (Mandate or Vaccine Mandate). The Mandate required all judicial and non-judicial personnel—across the entire state—to be vaccinated, beginning September 27, 2021.

31. DiFiore did not consult with the Chief Judges of the four (4) other Departments as required by the Judiciary Law.

32. Marks implemented, oversaw, and organized the implementation of the Mandate.

33. Per the Mandate, any employee—without a medical or religious exemption—not vaccinated by September 27, 2021—was prohibited from reporting to work. They also faced disciplinary action, including lost wages, lost benefits, suspension, or termination.

34. Employees whose religious exemptions were granted must re-apply around September 2022, and then on an annual basis

35. Defendant UCS however, waived this requirement at some point in September 2022.

36. On or about September 23, 2021, Mr. DiPierro completed a form titled "Affidavit of religious objection to COVID-19 Vaccination." He then professed his religious beliefs in a form titled "Request for Religious Exemption From COVID-19 Vaccine Personal Statement Form."

37. Mr. DiPierro swore under oath that he objected to taking the vaccine based on "the catechism of the [Catholic] Church."

38. He further acknowledged above his signature that intentionally false statements are punishable as a class A misdemeanor.

39. Mr. DiPierro explained that the catechism is what guides his consciences and that it encompasses his direct relationship with God.

40. Mr. DiPierro cited the chapter, article, and paragraphs where the catechism exists. He elaborated that the moral conscience "present at the heart of the person, enjoins him at the appropriate moment to do good and to avoid evil."

41. Mr. DiPierro believes that "when a person listens to his conscience, the prudent man can hear God speaking." That is, Mr. DiPierro believes that God speaks to him through his conscience. To defy his conscience would be to disobey God.

42. Furthermore, Mr. DiPierro's conscience is his moral compass. And under the Catechism of the Catholic Church, God is steering the ship.

43. Mr. DiPierro's conscience told him that it was morally wrong to force someone to be injected against their will.

44. His belief was so strong that he sacrificed his career, pension, house, and ability to provide for his family.

45. He has not wavered an inch since then.

46. Mr. DiPierro's conscience spoke to him. It told him that something was not right. Accordingly, he made one of the most difficult decisions of his life and chose not to be complicit.

47. Mr. DiPierro knew then, what the media, politicians, and others are slowly learning now: the vaccine does not stop the transmission of the virus and it is not safe and effective for everyone.

48. Defendants denied Mr. DiPierro's request on or about November 9, 2021.

49. Defendants did not provide Mr. DiPierro with a reason for his denial or a means to appeal.

50. Mr. DiPierro requested to be accommodated just as the defendants had accommodated other court officers through masking, weekly testing, temperature checks, and other measures.

51. Defendants refused to accommodate him.

52. Defendants never claimed that it would cause an undue hardship.

53. Michael J. Siudzinski—an attorney with the OCA Counsel's Office—told Mr. DiPierro that "many individuals who identify as Catholic have followed their

8

conscience to become vaccinated. Indeed, Pope Francis has urged everyone, including Catholics, to get vaccinated."

54. Siudzinski further stated that "it is not the role of UCS and the committee to interpret your religious identity as Catholic following your conscience to determine what, if any, Catholic teachings prohibit you from accepting the vaccine."

55. Siudzinski—acting on OCA's behalf—shockingly insinuated that Mr. DiPierro's beliefs were wrong. He also grossly misstated the applicable standard.

56. Further, Mr. DiPierro clearly expressed why his conscience forbid him from receiving the vaccine and identified the Catechism of the Catholic Church. The OCA did not have to do any guesswork.

57. Siudzinski glib comments create numerous inferences of discrimination.

58. Moreover, Mr. DiPierro does not *identify* with being Catholic, he is Catholic.

59. Describing religion as something someone identifies with demonstrates that Siudzinski and by extension the defendants, lacked a fundamental understanding of Mr. DiPierro's religious beliefs.

60. Considering that OCA's counsel put this in writing, there is a strong inference that the VEC played by its own rules.

61. At some point after Defendants refused to accommodate Mr. DiPierro, the exemption process changed.

62. Upon receiving numerous, valid, applications Defendants added a supplemental form.

63. The supplemental form was created because most applications asserted the same religious objections: the use of fetal cells in the development of the vaccines and religious beliefs involving the body's connection to God.

64. Mrs. Zweig requested a religious accommodation on or about September 20, 2021.

65. Like Mr. DiPierro, Mrs. Zweig completed the affidavit and issued a personal statement under oath that her sincerely held religious beliefs prohibited her from receiving the vaccine. Mrs. Zweig also acknowleged that false statements intentionally made may be punishable as a class A misdemeanor.

66. Mrs. Zweig explained that in her faith she respects the sanctity of human life. It is a tenant of her religion that human life begins in the womb, at conception. Mrs. Zweig cited Genesis 1:27 and Jeremiah 1:5 from the Bible.

67. Mrs. Zweig indicated that the vaccines were developed and tested using aborted human fetal cells. As such, her religious beliefs prohibited her from taking a vaccine that was derived from aborted fetal cells.

68. Secondarily, Mrs. Zweig indicated that the teachings of the Episcopal Church "include the principles of individual freedom" and that a person may refuse medical intervention if his or her informed conscience concluded that "he or she ought not to receive it or benefit from it, even if in error."

69. Mrs. Zweig even stated that she refused to take the chicken pox vaccine because it was derived from aborted fetal cells.

70. Mrs. Zweig worked in person while her application was pending.

71. Nevertheless, on or about November 5, 2021, the UCS notified Mrs. Zweig that the VEC required additional information. The VEC required her to complete the supplemental form.

72. Mrs. Zweig continued working while her request for accommodation was pending.

73. The supplemental form corroborated Mrs. Zweig's objection. It asserted that the vaccines used aborted fetal cell lines to produce or manufacture the vaccines. Which is exactly what Mrs. Zweig objected to. Her religious beliefs prohibited her from taking a vaccine that utilized aborted fetal cells in any stage of the manufacturing process. The vaccines still utilized aborted fetal cells prior to distribution.

74. Defendants were dismissive of Mrs. Zweig's religious beliefs.

75. Defendants put in the supplemental form that the fetal cells were cloned from an elective abortion or a miscarriage in the 1960s and 1970s. Defendants further emphasized that no fetal cell lines were in the vaccines and that fetal cell lines are that fetal cell lines have been used to develop important cancer treatments and therapies.

76. Mrs. Zweig's religious beliefs still prohibited her from taking the vaccines for the same reasons Defendants acknowledged.

77. Mrs. Zweig completed the supplemental form as instructed. She also explained that she was unaware that over-the-counter drugs utilized aborted fetal cell lines.

78. And even then, drugs like Tylenol have been around for such a long time that they were not derived from fetal cell lines. Unlike, COVID-19 vaccines, Tylenol existed independently of aborted fetal cell lines.

79. On or about December 29, 2021, the VEC summarily denied Mrs. Zweig's request for an accommodation without any reason.

80. Defendants terminated Mr. DiPierro on April 7, 2022.

81. Defendants terminated Mrs. Zweig on April 7, 2022.

82. The VEC was comprised of lawyers and administrators.

83. The VEC was not properly trained and lacked the wherewithal to differentiate between sincerely held religious beliefs and disingenuously held religious beliefs.

84. The VEC did not communicate with Plaintiffs.

85. The VEC did not engage in a meaningful exchange with Plaintiffs.

86. The VEC did not comprehend the importance of Plaintiff's religious beliefs.

87. The VEC prioritized operational efficiency over evaluating the applications.

88. VEC members were grossly intolerant of Plaintiffs sincerely held religious beliefs.

89. The VEC had no idea whose applications it was reviewing since personally identifying information was redacted.

90. The VEC lacked basic knowledge about the myriad of differences in religions.

91. Requests approved by the VEC were not subject to further review.

92. The VEC arbitrarily decided which requests to grant and which requests to deny.

93. Defendants had no objective basis to question the sincerity of Plaintiffs' religious beliefs.

94. The VEC had no rubric or criteria to examine each request.

95. Defendants could not claim that accommodating Plaintiffs would present an undue hardship.

FIRST CAUSE OF ACTION
**Failure to Reasonably Accommodate in Violation of Title VII**
(Against Defendants UCS and OCA)

96. Plaintiffs repeat and reallege the above as though full set forth herein.

97. To make out a *prima facie* claim[1] for failure to accommodate Plaintiffs must show that (1) they held a bona fide religious belief conflicting with an employment requirement; (2) they informed their employers of this belief; and (3) they were disciplined for failure to comply with the conflicting employment requirement.

98. Plaintiffs demonstrated their bona fide religious beliefs conflicted with the Mandate in their requests for religious accommodations.

99. Plaintiffs sent their requests for accommodations to their employer.

100. Their employer, UCS and OCA, terminated them for being unvaccinated.

---

[1] Plaintiffs do not have to make out a prima facie case at this stage of the proceedings and are not conceding that they do, nor raising their burden of proof.

## SECOND CAUSE OF ACTION
**Violation of the Free Exercise Clause Under the First Amendment and NY Const art. I §III**
Pursuant to 42 U.S.C §1983
(Against all members of the VEC, and Marks)

101. Plaintiffs repeat and reallege the above as though full set forth herein.

102. Pursuant to 42 U.S.C §1983 "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity . . ."

103. The First Amendment, as incorporated to the States through the Fourteenth Amendment, bars any law from prohibiting the free exercise of religion.

104. NY Const art. I §III provides that "the free exercise and enjoyment of religious profession and worship, without discrimination or preference, shall forever be allowed in this state to all humankind…"

105. The VEC arbitrarily decided which religious accommodations to accept and which to deny, thereby depriving Plaintiff's right to free exercise of their religious beliefs.

106. The VEC deprived Plaintiffs of their right to free exercise by recklessly disregarding whether their religious beliefs were sincerely held.

14

107. The VEC did not actually consider the validity of Plaintiffs sincerely held beliefs. The VEC took religion out of the exemption process. As such, the VEC violated the free exercise clause.

THIRD CAUSE OF ACTION
**Religious Discrimination in Violation of Title VII**
(Against Defendants UCS and OCA)

108. Plaintiffs repeat and reallege the above as though full set forth herein.

109. Under Title VII it is unlawful for an employer to terminate an employee under circumstances giving rise to an inference of discrimination.

110. UCS terminated Plaintiffs under circumstances giving rise to an inference of discrimination.

111. Mrs. Zweig asserted very specific religious grounds for an accommodation.

112. Mr. DiPierro cited the specific religious beliefs that conflicted with the Mandate.

113. UCS however, denied them anyway, without explanation.

114. UCS also distributed the supplemental form which discounted not only Plaintiff's religious beliefs, but that of many others.

115. The supplemental form discounted Plaintiff's beliefs.

116. It insinuated that their beliefs were inconsistent with logic and practicality. As though the use of fetal cells in cancer drugs, or that the fetal cells were cloned decades ago made Plaintiff's religious beliefs illegitimate.

117. The supplemental form itself gives rise to an inference that the UCS and OCA devalued Plaintiff's religious beliefs.

118. Even more, UCS targeted one of the most polarizing, divisive, issues this nation has grappled with: abortion.

119. Pro-life views in New York are unpopular.

120. Mrs. Zweig's religious beliefs are pro-life.

121. Attorney General Letisha James vocally opposed the United States Supreme Court's decision in the Dobbs case.

122. Governor Kathy Hochul ran her campaign—in part—on preserving a woman's right to choose.

123. Currently, Governor Hochul's nomination for the Chief Judge of the Court of Appeals faces extreme backlash for his perceived anti-abortion views.

124. UCS is intolerant of pro-life views.

125. UCS's termination of Mrs. Zweig gives rise to an inference of discrimination because of her pro-life religious beliefs.

126. UCS's termination of Mr. DiPierro gives rise to an inference of discrimination.

127. UCS did not even consider Mr. DiPierro's views to be religious.

128. UCS directly discounted the relationship between his conscience and God as nonsense.

129. UCS ignored that his belief stemmed from the Catechism of the Catholic Church.

130. The UCS scoffed at Mr. DiPierro's belief that his conscience was guided by God.

131. The UCS belittled his belief as personal—and not religious.

132. The Supplemental form's second section supports this as well.

133. Accordingly, Defendants UCS and OCA discriminated against Plaintiffs based on their religious beliefs.

FOURTH CAUSE OF ACTION
**Violation of the Equal Protection Clause Under the Fourteenth Amendment and NY Const art. I §XI**
Pursuant to 42 U.S.C §1983
(Against all members of the VEC, and Marks)

134. Plaintiffs repeat and reallege the above as though full set forth herein.

135. NY Const art, I §XI states that "[n]o person shall be denied the equal protection of the laws of this state or any subdivision thereof. No person shall, because of race, color, creed or religion, be subjected to any discrimination in his or her civil rights by any other person or by any firm, corporation, or institution, or by the state or any agency or subdivision of the state."

136. Under the Fourteenth Amendment no state shall "deny to any person within its jurisdiction, the equal protection of the laws."

137. The VEC and Marks decided the fate of Plaintiff's career based on their whim.

138. Said Defendants discriminated against Plaintiffs because of their religious beliefs.

139. Defendants arbitrarily and capriciously denied Plaintiffs' requests for accommodation.

140. Said Defendants violated the Fourteenth Amendments Equal Protection Clause and NY Const art. I §XI.

17

## REQUESTS FOR RELIEF

### First & Third Causes of Action

Plaintiffs seek compensatory damages and damages for pain and suffering in an amount exceeding $150,000.00 to be determined by a jury after trial.

### Second & Fourth Causes of Action

Plaintiffs seek compensatory damages, damages for pain and suffering and punitive damages in an amount exceeding $200,000.00 to be determined by a jury after trial.

Dated:   December 29, 2022
         Uniondale, New York

Respectfully Submitted,

_____

CHAD J. LAVEGLIA ESQ.,
LAW OFFICE OF CHAD J. LAVEGLIA PLLC
626 RxR Plaza, Suite #613
Uniondale, New York 11556
(631) 450-2468
claveglia@cjllaw.org